UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION


KEITH WILLIAMS,                          )
                                         )
                    Plaintiff,           )
                                         )
           v.                            )        No.  4:13CV880 TIA
                                         )
CAROLYN W. COLVIN, Acting                )
Commissioner of Social Security,         )
                                         )
                    Defendant.           )


## MEMORANDUM AND ORDER

This is an action under 42 U.S.C. §§ 405(g) and 1383(c)(3) for judicial

review of the Commissioner's final decision denying Keith Williams' application

for disability insurance benefits under Title II of the Social Security Act, 42 U.S.C.

§§ 401, *et seq.*, and application for supplemental security income under Title XVI

of the Act, 42 U.S.C. §§ 1381, *et seq.*  All matters are pending before the

undersigned United States Magistrate Judge, with consent of the parties, pursuant

to 28 U.S.C. § 636(c).  Because the Commissioner's final decision is supported by

substantial evidence on the record as a whole, it is affirmed.

### I.  Procedural History

On October 6, 2010, the Social Security Administration denied plaintiff

Keith Williams' March 11, 2010, applications for disability insurance benefits

(DIB) and supplemental security income (SSI), in which he claimed he became disabled on May 4, 2005, because of ruptured disc and rotator cuff, dizziness, and pain. (Tr. 87-88, 96-100, 148-58, 243.)[1] At plaintiff's request, a hearing was held before an administrative law judge (ALJ) on October 11, 2011, at which plaintiff, his father, and a vocational expert testified. (Tr. 44-85.) On December 30, 2011, the ALJ issued a decision denying plaintiff's claims for benefits, finding plaintiff able to perform work as it exists in significant numbers in the national economy. (Tr. 23-38.) On April 2, 2013, the Appeals Council denied plaintiff's request for review of the ALJ's decision. (Tr. 1-5.) The ALJ's determination thus stands as the final decision of the Commissioner. 42 U.S.C. § 405(g).

In the instant action for judicial review, plaintiff claims that the ALJ's decision is not supported by substantial evidence on the record as a whole, arguing generally that his severe impairments render him incapable of performing any substantial work. Plaintiff also contends that the ALJ erred by discounting the

---

[1] Plaintiff filed applications for benefits in April 2005 and April 2006, which were denied on initial consideration and not pursued further. Plaintiff also filed applications for benefits in August 2009, which were denied November 20, 2009, and not pursued further. At the administrative hearing on plaintiff's current applications, plaintiff requested that his alleged onset date be amended to September 14, 2009, and that his August 2009 applications for benefits be reopened. (Tr. 26, 49-50.) In her written decision, the ALJ determined not to reopen any previous application (Tr. 26), and plaintiff does not challenge this determination. The disability determination on plaintiff's current applications for benefits is thus limited to the period following the Commissioner's most recent final decision on plaintiff's previously filed applications, that is, the period since November 20, 2009. *Janka v. Secretary of Health, Educ. & Welfare*, 589 F.2d 365 (8th Cir. 1978). *See also Ellis v. Barnhart*, 392 F.3d 988, 991 n.2 (8th Cir. 2005).

medical opinion of his treating psychologist, Dr. Lipsitz. Plaintiff requests that the final decision be reversed and that the matter be remanded for further consideration. For the reasons that follow, the ALJ did not err in her determination.

## II. Testimonial Evidence Before the ALJ

A.  Plaintiff's Testimony

At the hearing on October 11, 2011, plaintiff testified in response to questions posed by the ALJ and counsel.

At the time of the hearing, plaintiff was thirty-three years of age. Plaintiff stands five-feet, eight inches tall and weighs 185 pounds. Plaintiff is single and lives with his parents. Plaintiff's brother and family also live in the same household. Plaintiff has a ninth grade education and was currently making arrangements to obtain his GED. (Tr. 51-52, 65.)

Plaintiff's Work History Report shows that he worked as a cook, dishwasher, and stocker at fast food restaurants and grocery stores from 1993 to April 2009. In 1995 and 1996, plaintiff worked as a carpet cleaner. In 1997 and 1998, plaintiff worked delivering sod. From 1998 to 2003, plaintiff worked for a moving company, moving furniture. In 2003 and 2004, plaintiff worked for three months as a farm worker. (Tr. 281.) Plaintiff testified that he was terminated from his last job in 2009 for unknown reasons when he completed his ninety-day

probation period.  Plaintiff testified to a number of other short-term jobs from which he was terminated for unknown reasons or because of inadequate performance.  (Tr. 53-57.)  Plaintiff testified that he voluntarily left other jobs because of dissatisfaction or inadequate pay.  (Tr. 57-60.)

Plaintiff testified that he is unable to work because of constant pain in his back and neck.  Plaintiff testified that he underwent neck surgery, which initially helped his pain, but that he thereafter began having headaches.  Plaintiff testified that his doctor advised him that additional surgery would "probably put [him] in a wheelchair."  Plaintiff testified that the pain causes dizziness and aggravates his headache condition.  (Tr. 60-63.)

Plaintiff testified that he experiences headaches once or twice a week – each lasting up to eighteen hours – and that they measure a level eight or nine on a scale of one to ten.  Plaintiff takes medication for the condition and lies down for four or five hours.  (Tr. 60-63, 70.)

Plaintiff testified that he also suffers from depression because he has to borrow money from others.  Plaintiff testified that he stays in bed three or four days a week because of his depression.  (Tr. 71-72.)  Plaintiff testified that he sometimes has difficulty with memory and concentration.   Plaintiff testified that he does not have trouble dealing with people.  (Tr. 64-65.)

Plaintiff currently sees two doctors.  He no longer regularly sees Dr. Litpsitz

and was advised to see him when needed. Plaintiff testified that he takes medication for dizziness, headaches, and anxiety and experiences dizziness as a side effect. (Tr. 62-63.)

As to his exertional abilities, plaintiff testified that he has difficulty climbing stairs because of pain in his hips and can lift no more than ten pounds because of pain in his shoulder. Plaintiff testified to having no difficulty sitting. (Tr. 64.)

As to his daily activities, plaintiff testified that his mother makes him breakfast after which he sits and does GED-related tasks on the computer. Plaintiff testified that he occasionally goes to the library but usually stays at home. Plaintiff does not help much with the household chores but does his own laundry. (Tr. 65-66.) Plaintiff reads and does not watch a lot television. Plaintiff testified the he no longer drinks because of his medical issues. (Tr. 67-68.)

B.    Testimony of Plaintiff's Father

Plaintiff's father, James E. Williams, Jr., testified at the hearing in response to questions posed by the ALJ and counsel.

Mr. Williams testified that plaintiff has lived at home for several years. Mr. Williams testified that, since his neck surgery in 2009, plaintiff has suffered from severe headaches and arm pain. Mr. Williams testified that plaintiff stops everything he is doing and lies down during his headache episodes, and quite often spends his day in bed. Mr. Williams testified that plaintiff also experiences

depression, which he believes to be related to his pain.  (Tr. 74-76.)

C.    Testimony of Vocational Expert

Gary Weimholt, a private vocational rehabilitation consultant, testified at the hearing in response to questions posed by the ALJ and counsel.

Mr. Weimholt classified plaintiff's past work as a kitchen helper and fast food cook as medium and unskilled; as a van driver/helper as very heavy and unskilled; as a delivery person as light and unskilled; and as a rug cleaner as medium and semi-skilled.  (Tr. 80.)

The ALJ asked Mr. Weimholt to assume a person of plaintiff's age, education, and past work experience, and to further assume the person able to perform light exertional work.  The ALJ then asked the vocational expert to assume the individual was limited to only simple, repetitive tasks with occasional contact with supervisors, coworkers, and the public.  Mr. Weimholt testified that such a person could not perform any of plaintiff's past work but could perform work as a cleaner/housekeeper, of which 6,500 such jobs exist in the State of Missouri; as an inspector and hand packager, of which 7,500 such jobs exist in the State of Missouri and 325,000 nationally; and small parts and products assembler, of which 7,500 such jobs exist in the State of Missouri and 325,000 nationally. (Tr. 82.)

The ALJ then asked Mr. Weimholt to assume the same individual but that he

would be absent from work four days a month because of his medical issues. Mr. Weimholt testified that such a person could not perform any work in the regional or national economies. (Tr. 82.)

Counsel asked Mr. Weimholt to assume the individual from the first hypothetical and to further assume the person to

> often have deficiencies of concentration, persistence, or pace so they couldn't complete tasks in a timely manner – and by "often" I'm referring to at least several times during the week if not daily; in addition to that, that there would be frequent inability to – or inability to interact with others and maintain proper social conduct and avoid altercations[.]

(Tr. 83.) Counsel clarified that the person's deficiencies in concentration, persistence, or pace would affect at least twenty-five percent of their daily production. Mr. Weimholt testified that no jobs would be available for such a person. (Tr. 84.)

### III. Educational and Vocational Records

On March 24, 1994, the Francis Howell School District summarized its staff assessment relating to plaintiff's school performance. Plaintiff was in the ninth grade and sixteen years of age. It was noted that plaintiff was in a combination of learning disorder classes, behavioral disorder classes, and regular classes but that such placement had not been successful because of poor attendance and work completion difficulties. Classroom observations showed plaintiff to have difficulty grasping new concepts at a normal pace, using reasoning and problem solving

skills, making inferences and interpretations, responding appropriately to social situations, exhibiting age-appropriate self-help skills, assuming responsibility for his own work, and completing work on time. Plaintiff's academic skills were noted to be weak in the areas of basic reading, reading comprehension, math calculation, reasoning, and written language, with plaintiff's performance in such areas ranging from the third to sixth grade levels. Assessment of plaintiff's cognitive ability showed him to function in the low average to borderline range. Administration of the IPAT Depression and Anxiety Scale showed plaintiff to be depressed at a level that was clinically significant. It was determined that plaintiff met the eligibility criteria to be diagnosed as behaviorally disordered/emotionally disturbed as demonstrated by an inability to get along with peers and teachers to a marked degree. (Tr. 204-15.)

During his ninth grade year, plaintiff failed all of his high school classes. (Tr. 229.)

From August to October 2008, plaintiff was a client at MERS/Goodwill. He was thirty years of age and qualified for employment assistance because of his cognitive impairments due to borderline intellectual functioning that resulted in deficits in all higher order cognitive processes, academics, decision making, judgment, motivation/initiative, ability to assume responsibility, tolerance to frustration, and problem solving. During testing to measure work skills and

capabilities, plaintiff obtained below average scores.  Plaintiff was encouraged during this period to continue to attend classes to prepare for the GED so that employment opportunities would be more readily available to him.  It was recommended that plaintiff pursue employment in fast food restaurants or cooking positions in other restaurants such as Denny's or Waffle House.  Plaintiff repeatedly turned down MERS/Goodwill's offers for staffing, indicating that he was working for a temporary employment agency.  In October, plaintiff advised that he had secured full time employment as a cook at a Holiday Inn.  MERS/ Goodwill's employment services terminated at that time.  (Tr. 181-200.)

## IV.  Medical Records Before ALJ

Throughout the medical record, references are made to an accident in 2003 whereupon plaintiff fell down multiple flights of stairs while moving a freezer, causing injury to his back and shoulder.  In April 2004, plaintiff was treated at Barnes-Jewish St. Peters Hospital for complaints of weakness in the arms bilaterally and a feeling that both shoulders were "out of place."  He was diagnosed with degenerative disc disease of the cervical spine and radiculitis and was prescribed Ultram, Flexeril, and Anaprox.  (Tr. 396-99.)

Plaintiff visited Volunteers in Medicine in May 2006 with complaints of right shoulder pain and numbness in his right hand.  Limited range of motion and a clicking sensation were noted about the shoulder.  Plaintiff was diagnosed with

unstable right shoulder.  (Tr. 323.)  An MRI of the right shoulder dated May 10 showed four moderate-sized tears of the infraspinatus and supraspinatus tendons, interpreted to be rotator cuff tear requiring "a complicated and extensive surgical procedure."  (Tr. 326.)

On February 20, 2008, Volunteers in Medicine provided plaintiff a note permitting him to return to work.  It was noted that plaintiff was to be an over-the-road truck driver and needed a medical note to do so.  Examination showed no pain or tenderness about the right shoulder, and plaintiff had full range of motion.  Plaintiff was diagnosed with recovered right rotator cuff injury and was cleared to return to work on March 1, 2008.  (Tr. 374.)

Plaintiff visited Dr. Charles Linsenmeyer at Volunteers in Medicine on August 5, 2009, with complaints of pain in both shoulders and intermittent numbness and weakness in his arms.  Plaintiff also complained of pain in his right hip and thigh, but reported such pain to be "okay."  Plaintiff was taking no medications.  Physical examination showed full range of motion about the cervical spine and right shoulder, with reflexes measured to be 4+.  Dr. Linsenmeyer diagnosed plaintiff with history of rotator cuff tear, without follow up in 2006; and cervical radiculopathy.  (Tr. 372.)

An MRI of the cervical spine dated August 10, 2009, showed large central disc herniation at C3-4 with severe canal stenosis compression of the cord and

secondary myelopathy with intramedullary cord signal. It was opined that such condition likely accounted for plaintiff's bilateral upper extremity symptoms. Abnormal configuration to the C2-3 vertebral body and dens was also noted, considered to possibly be congenital fusion of the C2 and C3 including the posterior elements and spinous processes. (Tr. 366.)

During a follow up examination on August 12, 2009, Dr. Linsenmeyer noted plaintiff to have hyperactive reflexes and intact strength. Plaintiff was not taking any medications. Plaintiff was diagnosed with severe cervical disk herniation with myelopathy. Plaintiff was referred to Dr. Stanley Martin and was instructed to limit his activities. Dr. Linsenmeyer opined that plaintiff was totally and permanently disabled for one year. (Tr. 364-65.) X-rays of the cervical spine taken August 28 showed congenital fusion of two vertebra at the level of C2, and focal posterior disk spurring at C2-3. (Tr. 370.)

Plaintiff visited Dr. Martin on August 20, 2009, upon referral by Dr. Linsenmeyer and reported constant pain in the neck radiating down the right arm to the elbow. Plaintiff also reported tingling in the arms and hands bilaterally and worsening of a weak right grip. Plaintiff reported no difficulties with his lower extremities. Physical examination showed no tenderness about the cervical spine. Good strength was noted about all four extremities with no focal weakness. Normal tone was noted in all four extremities without atrophy. Sensation was

intact.  Straight leg raising was negative, and manipulation of the hips did not reproduce pain.  Neurological exam showed plaintiff to have normal memory and attention span and a good fund of knowledge.  Dr. Martin reviewed the recent MRI and diagnosed plaintiff with mild cervical myelopathy.  Surgical options were discussed.  (Tr. 417-18.)

On September 14, 2009, plaintiff underwent a C3-4 anterior cervical microdiskectomy with allograft bone fusion and plate insertion.  (Tr. 409-11.)

During follow up examination on September 22, plaintiff reported to Dr. Martin that he had little neck pain and no weakness, numbness, or tingling. Plaintiff continued to take pain medication occasionally.  Plaintiff's gait was noted to be normal, and good strength was noted in both upper extremities.  Dr. Martin noted plaintiff to be doing very well.  Plaintiff was instructed to avoid lifting more than fifteen to twenty pounds and to avoid vigorous movements of his neck.  (Tr. 408.)

On October 13, plaintiff reported to Dr. Martin that he continued to experience numbness in his right upper arm and that he was now experiencing mild headaches.  Plaintiff denied neck pain or any radicular pain in the upper extremities.  Dr. Martin noted plaintiff to have good strength in both upper extremities and to have a normal gait.  Dr. Martin noted a recent x-ray of the cervical spine to show nice alignment at C3-4.  Dr. Martin opined that plaintiff was

doing very well.  Plaintiff was instructed to not engage in high-impact activities for four to six weeks.  (Tr. 509.)

On October 26, 2009, Robert Cottone, Ph.D., a psychological consultant with disability determinations, completed a Psychiatric Review Technique Form (PRTF) in which he opined that plaintiff's high borderline intellectual functioning caused mild limitations in activities of daily living; no limitations in maintaining social functioning; moderate limitations in maintaining concentration, persistence, or pace; and resulted in no repeated episodes of decompensation of extended duration.  (Tr. 511-21.)  In a Mental Residual Functional Capacity (RFC) Assessment completed that same date, Dr. Cottone opined that, in the domain of Understanding and Memory, plaintiff was markedly limited in his ability to understand and remember detailed instructions, but was not otherwise significantly limited.  In the domain of Sustained Concentration and Persistence, Dr. Cottone opined that plaintiff was markedly limited in his ability to carry out detailed instructions and moderately limited in his ability to maintain attention and concentration for extended periods, but was not otherwise significantly limited.  In the domain of Social Interaction, Dr. Cottone opined that plaintiff was not significantly limited in any regard.  In the domain of Adaptation, Dr. Cottone opined that plaintiff was moderately limited in his ability to set realistic goals or make plans independently of others, but was otherwise not significantly limited.

Overall, Dr. Cottone concluded that plaintiff retained the capacity to understand, remember, carry out, and persist at simple tasks; make simple work-related judgments; relate adequately to co-workers or supervisors; and adjust adequately to ordinary changes in work routine or setting. (Tr. 522-24.)

Plaintiff visited Dr. Linsenmeyer on November 4, 2009, with complaints of weakness in his right arm and reports that both shoulders spontaneously and frequently dislocate. Physical examination showed hyperactive reflexes bilaterally, good strength, some winging of the right scapula, and good range of motion about the cervical spine. Plaintiff was diagnosed with recurrent subluxation of the right shoulder, with lesser problems with the left shoulder. Plaintiff was advised to undergo evaluation by an orthopedic surgeon. (Tr. 568.)

Plaintiff visited Volunteers in Medicine on February 3, 2010, with complaints of headaches and episodes of dizziness. Plaintiff also reported experiencing intermittent numbness and tingling in both hands. Plaintiff was noted to be taking no medications. (Tr. 567.) An MRI of the cervical spine dated February 17 showed anterior fusion of C2 to C3. Disk osteophyte complex at C2-3 was noted to have a moderate impression on the anterior aspect of the thecal sac, narrowing the AP dimension of the spinal canal. (Tr. 545.)

Plaintiff was admitted to the emergency room at SSM St. Joseph Health Center on February 18, 2010, after his neck locked up. Plaintiff reported his

current pain to be at a level two but that the pain worsened with movement. Plaintiff reported experiencing dizziness and tingling, but denied any weakness or headaches. CT scans and x-rays of the cervical spine yielded no abnormal results. Plaintiff was given Dilaudid and reported doing much better. After treatment, plaintiff was able to turn his head and neck easily from side to side but continued to complain of dizziness. Plaintiff was diagnosed with cervical pain, neck pain, dizziness, and giddiness, and was prescribed Meclizine to take as needed for dizziness. Upon discharge, plaintiff was instructed to engage in activity as usual but to avoid sudden "jerky-type" and "risky-type" activity. (Tr. 640-54.)

Plaintiff returned to Dr. Martin on March 2, 2010, and reported continued numbness in his hands. Plaintiff also reported that his neck locked up a few weeks prior, requiring the assistance of EMS. Plaintiff reported occasional dizziness. Physical examination showed plaintiff to have intact sensation, a normal gait, and good strength in all four extremities without focal weakness. Dr. Martin noted recent diagnostic studies to show mild narrowing of the canal at C3-4. Dr. Martin noted plaintiff to have experienced little improvement since his surgery but also that his condition had not worsened. Dr. Martin questioned the etiology of plaintiff's neck locking up and suspected a significant vertebral artery abnormality. Surgical options were discussed, but Dr. Martin recommended to plaintiff that he hold off on additional surgery. Dr. Martin diagnosed plaintiff with cervicalgia, and

brachial neuritis or radiculitis.  Physical therapy was prescribed.  (Tr. 532-34, 660.)

On March 15, 2010, plaintiff reported to Dr. Linsenmeyer that headaches keep him awake at night and that he experiences dizziness with his headaches.  It was noted that plaintiff took no medications.  Plaintiff's past medical history was noted.  (Tr. 566-67.)  An MRI of the brain dated March 22 yielded findings consistent with early small vessel ischemic change, migraine, demyelinating disease, or Lyme disease.  No evidence of mass lesion or abnormal enhancement was noted.  (Tr. 564.)

Plaintiff visited St. Charles Orthopaedic Surgery Associates on April 7, 2010, upon referral from Volunteers in Medicine.  It was noted that MRI imaging ordered by Dr. Linsenmeyer showed some rotator cuff degenerative changes but that plaintiff had "not tried much in the way of nonoperative treatment" for the shoulder.  Plaintiff's radicular symptoms down the right arm were noted.  Physical examination showed plaintiff to exhibit some pain with range of motion about the shoulder.  Tenderness was noted over the anterior aspect of the shoulder, with mildly positive impingement sign.  No instability was noted.  A cortisone injection to the shoulder was administered, and it was suggested that plaintiff try non-surgical modalities before seeking operative care for the condition.  Plaintiff was encouraged to "work hard to get better and not seek disability for this."  (Tr. 664.)

Plaintiff visited Volunteers in Medicine on May 3, 2010, and complained of

persistent headaches and neck pain. Plaintiff's medical history was noted. It was noted that plaintiff complained of new occipital head pain. Plaintiff also reported having dizzy spells that last about one hour and that he sits down during such spells. Plaintiff reported that he feels that he will pass out. It was noted that plaintiff took no medications. It was noted that plaintiff's cervical myelopathy would probably not get better and that such condition may account for his dizziness, light headedness, and head and neck pain. It was determined that a vertigo suppressant would be tried. (Tr. 705.) Ultram was prescribed. (Tr. 703.)

Plaintiff visited David Lipsitz, Psy.D., on May 20, 2010, who noted plaintiff's past medical and social history. It was noted that plaintiff was not very active. Plaintiff reported having dropped out of high school in the ninth grade after his buddy died and that he was currently studying for his GED. Plaintiff reported not having many friends in that they were dead, in jail, or had moved away. Dr. Lipsitz noted plaintiff to be taking no medication other than pain medication. Plaintiff reported his activities to include fishing, working on his truck, and watching television. Plaintiff reported that his goal was to not be so depressed. Dr. Lipsitz diagnosed plaintiff with major depression and recommended further evaluation. (Tr. 670-71.)

On the Wechsler Adult Intelligence Scale-IV (WAIS-IV) administered by Dr. Lipsitz on May 27, 2010, plaintiff obtained the following IQ scores: verbal,

81; perceptual reasoning, 75; working memory, 69; processing speed, 74; full scale, 71.  (Tr. 673.)

Plaintiff visited Dr. Lipsitz on June 3, 2010, and complained of severe pain in his neck and down his shoulder.  Plaintiff reported having been in bed for the past four or five days.  Plaintiff's mood was down.  Plaintiff reported his parents to be fighting about his brother who had just been sent to prison for possession of marijuana.  Plaintiff was instructed to return the following week.  (Tr. 672.)

On that same date, Dr. Lipsitz reported to the Social Security Administration that plaintiff suffered from severe depression and anxiety and had borderline intelligence.  Dr. Lipsitz reported that plaintiff would probably need treatment for depression.  Dr. Lipsitz opined that plaintiff experienced marked limitations in his activities of daily living; in maintaining social functioning; and in maintaining concentration, persistence, or pace.  (Tr. 669.)

Plaintiff visited Dr. Linsenmeyer on June 23, 2010, and complained of pain in his shoulders bilaterally as well as in his neck, low back, and right hip.  Plaintiff also reported having numbness in both arms.  Plaintiff reported his headaches to be worse than a migraine and worse than what he experienced prior to surgery.  Dr. Linsenmeyer noted plaintiff's reflexes in his upper extremities to be hyperactive and his strength to be excellent.  (Tr. 709-10.)  Ultram was prescribed.  (Tr. 703.)  X-rays of the cervical spine dated June 24 yielded no abnormal results.  (Tr. 716.)

Blood tests on July 2, 2010, were negative for Lyme disease. (Tr. 715.)

On September 14, 2010, plaintiff underwent a consultative psychological evaluation for disability determinations. Plaintiff reported to Dr. Thomas J. Spencer that he experiences issues with his back and recurring headaches that sometimes cause pain to a degree that he cannot move his neck. Plaintiff reported experiencing pain throughout his body, but that his neck is primarily affected. Plaintiff reported that he experiences pain at a level ten every day. Plaintiff reported that he is generally able to complete day-to-day activities but feels he cannot work. Plaintiff reported doing his own laundry, preparing his own meals, and vacuuming. Plaintiff reported no sleep difficulties. Plaintiff expressed uncertainty as to why he was sent to a psychologist, but reported that sitting at the house can "mess[] with your head." Plaintiff reported having experienced depression in the past and that he continues to have some days where he feels down and depressed, but that he did not think his depression was severe. Plaintiff reported having no energy and wanting to stay in bed when feeling depressed. Plaintiff had no crying spells. Plaintiff reported his concentration and attention to be poor when his head hurts. Plaintiff reported having had periodic thoughts of suicide but none currently. Plaintiff reported that he enjoys hanging out and fishing. Plaintiff also reported that he works on his truck and was hoping to repaint it soon. Plaintiff reported that he recently sought therapy from Dr. Lipsitz

because of the stress he was experiencing with his situation, and that he currently saw Dr. Lipsitz every few weeks. Plaintiff had not seen a psychiatrist and had not been prescribed any psychotropic medication. Mental status examination showed plaintiff to be alert and oriented times four. His affect was neutral, and he reported his mood to be "spaced out." Plaintiff's flow of thought was noted to be intact and relevant. Dr. Spencer opined that plaintiff had below average intelligence. No impairment in long-term memory was noted. Plaintiff could not spell the word "world" but could complete simple arithmetic. Testing scores were not suggestive of malingering. Dr. Spencer diagnosed plaintiff with major depressive disorder, recurrent, moderate; alcohol dependence in sustained remission; and borderline intellectual functioning. Dr. Spencer noted that plaintiff's symptoms of depression seemed situational. Dr. Spencer assigned a Global Assessment of Functioning (GAF) score of 55-60[2] (Tr. 676-79) and concluded with his opinion that plaintiff

> retains the ability to understand and remember simple instructions. Furthermore, he retains the ability to engage in and persist with simple to moderately complex tasks. Mr. Williams demonstrated moderate impairment in his ability to interact socially and adapt to change in the workplace. He did not appear to need assistance in managing his benefits.

(Tr. 679.)

---

[2] A GAF score considers "psychological, social, and occupational functioning on a hypothetical continuum of mental health/illness." *Diagnostic and Statistical Manual of Mental Disorders, Text Revision 34* (4th ed. 2000). A GAF score of 51 to 60 indicates moderate symptoms (*e.g.*, flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (*e.g.*, few friends, conflicts with peers or co-workers).

On October 5, 2010, Kyle DeVore, Ph.D., a psychological consultant with disability determinations, completed a PRTF in which he opined that plaintiff's borderline intellectual functioning, major depressive disorder, and alcohol dependency in remission caused no limitations in plaintiff's activities of daily living; and moderate limitations in maintaining social functioning and in maintaining concentration, persistence, or pace. (Tr. 680-91.) In a Mental RFC Assessment completed that same date, Dr. DeVore opined that, in the domain of Understanding and Memory, plaintiff was moderately limited in his ability to understand and remember detailed instructions, but otherwise was not significantly limited. In the domain of Sustained Concentration and Persistence, Dr. DeVore opined that plaintiff was moderately limited in his ability to carry out detailed instructions; maintain concentration and attention for extended periods; work in coordination with or proximity to others without being distracted by them; complete a normal workday and workweek without interruptions from psychologically-based symptoms; and perform at a consistent pace without an unreasonable number and length of rest periods. In the domain of Social Interaction, Dr. DeVore opined that plaintiff was moderately limited in his ability to interact appropriately with the general public, accept instructions, and respond appropriately to criticism from supervisors, but otherwise was not significantly limited. Finally, in the domain of Adaptation, Dr. DeVore opined that plaintiff was

moderately limited in his ability to respond appropriately to changes in the work setting, but otherwise was not significantly limited. Dr. DeVore concluded with an opinion that plaintiff retained the ability to ask simple questions; understand, follow, and complete simple instructions and directions; and perform at least simple, unskilled tasks. Dr. DeVore further opined that plaintiff would benefit from a work environment where he had limited social interaction. (Tr. 692-94.)

On October 13, 2010, plaintiff visited Dr. E. F. Vastola at Volunteers in Medicine after having been involved in a motor vehicle accident three days prior from which he suffered cervical whiplash. X-rays of the cervical spine yielded no abnormal results. Plaintiff reported obtaining some relief with Tramadol. Plaintiff complained of continued shoulder and neck pain that was always present but reported it to worsen with any exertion at which time he also experiences numbness and tingling. Upon physical examination and review of diagnostic tests, Dr. Vastola diagnosed plaintiff with brachial plexus impingement in a thoracic outlet syndrome. He determined to manage the condition conservatively, prescribing Tramadol as needed with possible referral to a physiotherapeutic program. Plaintiff was continued on Tramadol. (Tr. 703, 711-12, 713.)

Between June 10 and October 28, 2010, plaintiff visited Dr. Lipsitz on ten occasions. During this time, plaintiff continued to complain of headaches and pain in his neck, shoulders, and back, and Dr. Lipsitz observed plaintiff to be

preoccupied by this pain. Plaintiff also continually reported being bored. Plaintiff reported arguing and having ongoing conflict with his father. Throughout this period, plaintiff kept Dr. Lipsitz apprised of the status of his disability proceedings. (Tr. 696-98.)

On November 3, 2010, plaintiff reported to Volunteers in Medicine that his neck and shoulder pain had worsened since his last visit. It was noted that plaintiff was taking Tramadol. Plaintiff left this appointment before being seen by Dr. Vastola. (Tr. 711.)

On November 5 and December 2, 2010, plaintiff failed to appear for scheduled appointments with Dr. Lipsitz. (Tr. 698, 699.)

On December 15, 2010, plaintiff failed to appear for a scheduled appointment at Volunteers in Medicine. (Tr. 711.)

Plaintiff visited Crider Health Center (Crider) on July 18, 2011. Plaintiff's medical and psychiatric history was noted. It was noted that plaintiff was not taking any psychiatric medications. It was also noted that plaintiff continued to experience headaches and dizzy spells and that he took Tramadol for the conditions. Plaintiff reported that he was an alcoholic and underwent treatment for the condition fifteen years prior. Plaintiff reported having last drank two days prior. Plaintiff reported currently having a depressed mood and crying spells with feelings of hopelessness and worthlessness. Plaintiff also reported fatigue,

distractibility, and irritability.  Plaintiff reported not being socially withdrawn but that he was anhedonic.  Plaintiff reported having suicidal and homicidal ideations but no plan.  Plaintiff reported having serious rage problems and that his girlfriend feared that he could seriously hurt someone.  Mental status examination showed plaintiff to be alert and oriented but distraught, skeptical, evasive, and distrustful.  Plaintiff's eye contact was noted to be distant, and his speech was mumbling and inaudible at times.  Plaintiff's thought process was coherent and relevant.  Plaintiff's judgment was noted to be impaired and his insight poor.  Plaintiff was diagnosed with major depressive disorder, recurrent, non-psychotic; alcohol dependence; and intermittent explosive disorder.  Plaintiff was assigned a GAF score of 50.[3]  Plaintiff was prescribed Celexa and was referred to anger management therapy.  (Tr. 725-27.)

On August 4, 2011, Dr. Lipsitz completed an RFC Assessment for Mental Disorders in which he reported that plaintiff experienced major depression and borderline intellectual functioning and had a GAF score of 50.  Dr. Lipsitz reported that plaintiff exhibited the following symptoms of his impairments:  anger, depression, resentment, feelings of guilt or worthlessness, hostility and irritability, persistent anxiety, emotional mood manifestations, poor memory recall, poor or

---

[3] A GAF score of 41-50 indicates serious symptoms (*e.g.*, suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (*e.g.*, no friends, unable to keep a job).

inappropriate fund of knowledge, poor commonsense judgment, poor insight, and psychomotor agitation or retardation. Dr. Lipsitz opined that plaintiff's psychiatric condition exacerbated his perception of pain. With respect to plaintiff's abilities to perform work activities on a day-to-day basis, Dr. Lipsitz opined that plaintiff had good or fair mental abilities and aptitude needed to do unskilled work and fair mental abilities and aptitude needed to do semi-skilled and skilled work. Dr. Lipsitz further opined that plaintiff had good mental abilities and aptitude to maintain socially appropriate behavior, adhere to basic standards of neatness and cleanliness, travel in unfamiliar places, and use public transportation; and fair ability to interact appropriately with the general public. Dr. Lipsitz opined that plaintiff was moderately limited in his activities of daily living and in maintaining social functioning, and often experienced deficiencies of concentration, persistence, or pace resulting in a failure to complete tasks in a timely manner. Dr. Lipsitz then opined that, in the domain of Activities of Daily Living, plaintiff was markedly limited in his ability to plan daily activities. In the domain of Social Functioning, Dr. Lipsitz opined that plaintiff was markedly limited in his ability to exhibit social maturity, get along with family and friends, and avoid altercations. In the domain of Concentration and Performance, Dr. Lipsitz opined that plaintiff was markedly limited in concentration and persistence in tasks. Dr. Lipsitz further opined that plaintiff would exhibit intermittent or continuous difficulty with

holding a job, maintaining regular attendance and customary punctuality,

sustaining an ordinary routine without supervision, and responding appropriately to

criticism from supervisors. Dr. Lipsitz opined that plaintiff's symptoms would

frequently interfere with his attention and concentration and would cause moderate

limitation in his ability to deal with work stress. Dr. Lipsitz opined that plaintiff

would be absent from work in excess of three days each month. (Tr. 719-23.)

Plaintiff returned to Crider on August 15, 2011, for follow up and reported

that he is bored and frustrated sitting idle with no job. Plaintiff reported that

Celexa helped him but that it initially made him dizzy. Plaintiff was continued in

his diagnoses and was instructed to continue with Celexa. (Tr. 728.)

## V. The ALJ's Decision

The ALJ found plaintiff to meet the insured status requirements of the Social

Security Act through September 30, 2012. The ALJ found that plaintiff had not

engaged in substantial gainful activity since May 4, 2005, the alleged onset date of

disability.[4] The ALJ found plaintiff's depression and residuals of cervical fusion to

be severe impairments, but that he did not have an impairment or combination of

impairments that met or medically equaled an impairment listed in 20 C.F.R. Part

---

[4] Although plaintiff requested at the administrative hearing that the alleged onset date be
amended to September 14, 2009, there is no indication that the ALJ granted this request or that
the plaintiff filed any notice in the record of an amended onset date. As noted *supra* at n.1,
however, the determination of plaintiff's disability was nevertheless limited to the period after
November 20, 2009.

404, Subpart P, Appendix 1.  The ALJ found plaintiff to have the RFC to perform

light work[5] except that he was limited to unskilled work and simple, repetitive

tasks.  The ALJ found plaintiff unable to perform any of his past relevant work.

Considering plaintiff's age, education, work experience, and RFC, the ALJ

determined vocational expert testimony to support a finding that plaintiff could

perform other work existing in significant numbers in the national economy, and

specifically, cleaner/housekeeper, inspector, and small products assembler.  The

ALJ thus found that plaintiff was not under a disability from May 4, 2005, through

the date of the decision.  (Tr. 28-38.)

## VI.  Discussion

To be eligible for DIB and SSI under the Social Security Act, plaintiff must

prove that he is disabled.  *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir.

2001); *Baker v. Secretary of Health & Human Servs.,* 955 F.2d 552, 555 (8th Cir.

1992).  The Social Security Act defines disability as the "inability to engage in any

substantial gainful activity by reason of any medically determinable physical or

mental impairment which can be expected to result in death or which has lasted or

can be expected to last for a continuous period of not less than 12 months."  42

U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).  An individual will be declared disabled

---

[5] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying
of objects weighing up to 10 pounds. . . . [A] job is in this category when it requires a good deal
of walking or standing, or when it involves sitting most of the time with some pushing and
pulling of arm or leg controls."  20 C.F.R. §§  404.1567(b), 416.967(b).

"only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

To determine whether a claimant is disabled, the Commissioner engages in a five-step evaluation process.  *See* 20 C.F.R. §§ 404.1520, 416.920; *Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987).  The Commissioner begins by deciding whether the claimant is engaged in substantial gainful activity.  If the claimant is working, disability benefits are denied.  Next, the Commissioner decides whether the claimant has a "severe" impairment or combination of impairments, meaning that which significantly limits his ability to do basic work activities.  If the claimant's impairment(s) is not severe, then he is not disabled.  The Commissioner then determines whether claimant's impairment(s) meets or equals one of the impairments listed in 20 C.F.R., Subpart P, Appendix 1.  If claimant's impairment(s) is equivalent to one of the listed impairments, he is conclusively disabled.  At the fourth step, the Commissioner establishes whether the claimant can perform his past relevant work.  If so, the claimant is not disabled.  Finally, the Commissioner evaluates various factors to determine whether the claimant is capable of performing any other work in the economy.  If not, the claimant is

declared disabled and becomes entitled to disability benefits.

The decision of the Commissioner must be affirmed if it is supported by substantial evidence on the record as a whole. 42 U.S.C. § 405(g); *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Estes v. Barnhart*, 275 F.3d 722, 724 (8th Cir. 2002). Substantial evidence is less than a preponderance but enough that a reasonable person would find it adequate to support the conclusion. *Johnson v. Apfel*, 240 F.3d 1145, 1147 (8th Cir. 2001). This "substantial evidence test," however, is "more than a mere search of the record for evidence supporting the Commissioner's findings." *Coleman v. Astrue*, 498 F.3d 767, 770 (8th Cir. 2007) (internal quotation marks and citation omitted). "Substantial evidence on the record as a whole . . . requires a more scrutinizing analysis." *Id.* (internal quotation marks and citations omitted).

To determine whether the Commissioner's decision is supported by substantial evidence on the record as a whole, the Court must review the entire administrative record and consider:

1.    The credibility findings made by the ALJ.

2.    The plaintiff's vocational factors.

3.    The medical evidence from treating and consulting physicians.

4.    The plaintiff's subjective complaints relating to exertional and non-exertional activities and impairments.

5.    Any corroboration by third parties of the plaintiff's

impairments.

6.       The testimony of vocational experts when required which is based upon a proper hypothetical question which sets forth the claimant's impairment.

*Stewart v. Secretary of Health & Human Servs.,* 957 F.2d 581, 585-86 (8th Cir. 1992) (internal citations omitted).  The Court must also consider any evidence which fairly detracts from the Commissioner's decision.  *Coleman*, 498 F.3d at 770; *Warburton v. Apfel*, 188 F.3d 1047, 1050 (8th Cir. 1999).  However, even though two inconsistent conclusions may be drawn from the evidence, the Commissioner's findings may still be supported by substantial evidence on the record as a whole.  *Pearsall*, 274 F.3d at 1217 (citing *Young v. Apfel*, 221 F.3d 1065, 1068 (8th Cir. 2000)).  "[I]f there is substantial evidence on the record as a whole, we must affirm the administrative decision, even if the record could also have supported an opposite decision."  *Weikert v. Sullivan*, 977 F.2d 1249, 1252 (8th Cir. 1992) (internal quotation marks and citation omitted); *see also Jones ex rel. Morris v. Barnhart*, 315 F.3d 974, 977 (8th Cir. 2003).

For the following reasons, the ALJ committed no legal error, and her decision is supported by substantial evidence on the record as a whole.

A.       Medical Opinion Evidence

Plaintiff contends that the ALJ improperly weighed opinion evidence obtained from his treating psychologist, Dr. Lipsitz.  For the following reasons, the

ALJ did not err in her consideration of this evidence.

In evaluating opinion evidence, the Regulations require the ALJ to explain in the decision the weight given to any opinions from treating sources, non-treating sources, and non-examining sources. *See* 20 C.F.R. §§ 404.1527(f)(2)(ii), 416.927(f)(2)(ii).[6] The Regulations require that more weight be given to the opinions of treating physicians than other sources, and that controlling weight be given if the treating physician's assessment of the nature and severity of a claimant's impairments is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the record. 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2)*; see also Forehand v. Barnhart*, 364 F.3d 984, 986 (8th Cir. 2004). This is so because a treating physician has the best opportunity to observe and evaluate a claimant's condition,

> since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [a claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations.

20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).

---

[6] Citations to 20 C.F.R. §§ 404.1527 and 416.927 are to the 2011 version of the Regulations, which were in effect at the time the ALJ rendered the final decision in this cause. This Regulation's most recent amendment, effective March 26, 2012, reorganizes the subparagraphs relevant to this discussion but does not otherwise change the substance therein.

When a treating physician's opinion is not given controlling weight, the Commissioner must look to various factors in determining what weight to accord the opinion, including the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, whether the treating physician provides support for his findings, whether other evidence in the record is consistent with the treating physician's findings, and the treating physician's area of specialty. 20 C.F.R. §§ 404.1527(d), 416.927(d). The Regulations further provide that the Commissioner "will always give good reasons in [the] notice of determination or decision for the weight [given to the] treating source's opinion." 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).

In her written decision here, the ALJ discounted the RFC Assessment completed by Dr. Lipsitz finding the opinions rendered therein to be internally inconsistent. The ALJ specifically noted that while Dr. Lipsitz opined that plaintiff's social behavior was good to fair, he later described plaintiff's ability to exhibit social maturity, get along with family and friends, and avoid altercations to be markedly limited. The ALJ also noted the inconsistency in Dr. Lipsitz's opinion that plaintiff was able to manage his own benefits and had a good to fair mental ability to perform unskilled to skilled work when he also opined that plaintiff had poor commonsense judgment and poor memory and recall. Dr. Lipsitz provides no explanation for these inconsistent findings.

A treating physician's opinion may be given little weight because of its internal inconsistencies. *Anderson v. Barnhart*, 344 F.3d 809, 812-13 (8th Cir. 2003); *see also Wagner v. Astrue*, 499 F.3d 842, 849-50 (8th Cir. 2007) (and cases cited therein) (physician opinions that are internally inconsistent are entitled to less deference). Because of the internal inconsistencies contained within Dr. Lipsitz's RFC Assessment, the ALJ did not err in discounting the opinion of this treating psychologist.

B.    <u>Ability to Perform Work</u>

Plaintiff argues, generally, that the effects of his severe impairments render him unable to perform substantial work and that the ALJ erred in finding otherwise. Plaintiff does not identify or elaborate upon any limitations he claims should have been, but were not included in the ALJ's RFC determination. Nor does plaintiff present any argument demonstrating that he suffers restrictions more limiting than as determined by the ALJ and posed to the vocational expert in the hypothetical. *Cf. Robson v. Astrue*, 526 F.3d 389, 393 (8th Cir. 2008) (claimant did not identify what limitations were missing from the hypothetical). The burden to establish a claimant's RFC rests with the claimant. *Pearsall*, 274 F.3d at 1217. An ALJ is not required to disprove every possible impairment. *McCoy v. Astrue*, 648 F.3d 605, 612 (8th Cir. 2011).

By arguing generally that he cannot perform substantial work, plaintiff

essentially asks this Court to reweigh the evidence or review the factual record *de novo*, which it cannot do. *See Smith v. Colvin*, 756 F.3d 621, 626 (8th Cir. 2014). Instead, the Court reviews the record to ensure that the ALJ did not disregard evidence or ignore potential limitations. *McCoy*, 648 F.3d at 615.

Based on the administrative record here and the ALJ's thorough summary thereof, it cannot be said that the ALJ overlooked any of plaintiff's limitations. The ALJ summarized the medical evidence of record that showed diagnostic testing to yield no significant abnormal results subsequent to plaintiff's surgery in September 2009, as well as clinical findings repeatedly demonstrating plaintiff to have full range of motion, full strength, and intact sensation. The ALJ also noted that the restrictions imposed by plaintiff's treating surgeon did not preclude all activity; indeed, such restrictions - *i.e.,* lifting no more than twenty pounds, not engaging in high impact activities - appear to be consistent with the performance of light work. The ALJ also noted that plaintiff had been referred to physical therapy but that no evidence in the record showed him to have attended any physical therapy sessions. *See Brown v. Chater*, 87 F.3d 963, 965 (8th Cir. 1996) (claimant's failure to comply with prescribed medical treatment and lack of significant medical restrictions inconsistent with complaints of disabling pain). The ALJ also noted plaintiff's depression to be situational in nature. *See Gates v. Astrue*, 627 F.3d 1080, 1082 (8th Cir. 2010) (ALJ did not err in finding claimant's

depression not to be severe inasmuch as it was situational in nature, related to marital issues, and improved with medication and counseling). Finally, the ALJ noted plaintiff's IQ scores and his diagnosis of borderline intellectual functioning, and adequately accounted for any limitations arising therefrom with her RFC finding that plaintiff was limited to simple, repetitive work. *See Howard v. Massanari*, 255 F.3d 577, 582 (8th Cir. 2001).

The ALJ also summarized the non-medical evidence of record, including plaintiff's educational, work, and vocational record; plaintiff's testimony; and observations by third parties, and addressed the consistency of such evidence with other evidence of record.[7] Upon conclusion of her discussion of specific medical facts, non-medical evidence, and the consistency of such evidence when viewed in light of the record as a whole, the ALJ assessed plaintiff's RFC based on the relevant, credible evidence and set out plaintiff's exertional and non-exertional limitations and the effect of such limitations on plaintiff's ability to perform work-related activities. *Accord* SSR 96-8p, 1996 WL 374184, at *7 (Soc. Sec. Admin.

---

[7] Although plaintiff does not challenge the ALJ's credibility determination here, a review of the ALJ's decision nevertheless shows that, in a manner consistent with and as required by *Polaski v. Heckler*, 739 F.2d 1320 (8th Cir. 1984) (subsequent history omitted), the ALJ considered the subjective allegations of plaintiff's disabling symptoms on the basis of the entire record before her and set out numerous inconsistencies detracting from the credibility of such allegations. The ALJ may disbelieve subjective complaints where there are inconsistencies on the record as a whole. *Battles v. Sullivan*, 902 F.2d 657, 660 (8th Cir. 1990). The ALJ's credibility determination is supported by substantial evidence on the record as a whole, and thus the Court is bound by the ALJ's determination. *Robinson v. Sullivan*, 956 F.2d 836, 841 (8th Cir. 1992).

July 2, 1996).  Substantial evidence on the record as a whole supports these findings.  As noted above, plaintiff presents no evidence or argument demonstrating that he was more restricted than as determined by the ALJ.  Plaintiff's general claim that he cannot perform substantial work activity therefore fails.

Accordingly, for the reasons set out above on the claims raised by plaintiff on this appeal,

**IT IS HEREBY ORDERED** that the final decision of the Commissioner is **AFFIRMED**, and plaintiff's Complaint is dismissed with prejudice.

A separate Judgment in accordance with this Memorandum and Order is entered this same date.


       _/s/Terry I. Adelman_____
       UNITED STATES MAGISTRATE JUDGE


Dated this  _15th__  day of  __September__, 2014.